## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **RICHARD MILLER** | § | |
| | § | |
| *Plaintiff,* | § | **CIV. A. NO. 3:09-cv-0440-O** |
| | § | **ECF** |
| *v.* | § | |
| | § | |
| **RAYTHEON COMPANY,** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S POST-TRIAL BRIEF

Respectfully submitted,

GILLESPIE, ROZEN & WATSKY P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, Texas 75204
Tel: (214) 720-2009
Fax: (214) 720-2291

*/s/ Hal K. Gillespie*
————————————————————
Hal K. Gillespie
*Attorney-in-Charge*
Texas Bar No. 07925500
hkg@grwlawfirm.com
Yona Rozen
Texas Bar No. 17958500
yrozen@grwlawfirm.com
James D. Sanford
Texas Bar No. 24051289
jsanford@grwlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## <u>TABLE OF CONTENTS</u>

SUMMARY OF THE FACTS ................................................................................................1

ARGUMENTS AND AUTHORITIES ................................................................................4

      1.     Since reinstatement is not feasible and Raytheon's unlawful actions forced Miller into long-term unemployment, the Court should award Miller full front pay and benefits ...........................5

      2.     The jury's finding that Raytheon willfully discriminated against Miller because of age entitles him to liquidated damages age .........................................................................................14

      3.     The TCHRA entitles Miller to both pre-judgment and post-judgment interest..............................................................................14

      4.     Raytheon is liable for Miller's reasonable attorney's fees and costs because Miller is the prevailing party ..................................15

CONCLUSION...............................................................................................................15

CERTIFICAT OF SERVICE...........................................................................................17

## <u>TABLE OF AUTHORITIES</u>

### CASES

*City of Austin v. Gifford*,
        824 S.W.2d 735 (Tex. Ct. App.—Austin 1992, no writ)...................................14

*City of Houston v. Fletcher*,
        166 S.W.3d 479 (Tex. Ct. App.—Eastland 2005) ...........................................14

*Cummings v. Standard Register Co.*,
        265 F.3d at 56 (1st Cir. 2001) ........................................................................12

*Deloach v. Delchamps, Inc.*,
        897 F.2d 815 (5th Cir. 1990) ..........................................................................14

*Dibler v. Metwest, Inc.*,
        No. 3:95-cv-1046-BC, 1997 WL 222910 (N.D. Tex. 1997)............................11

*Downey v. Strain*,
        510 F.3d 534, 544 (5th Cir. 2007) ....................................................................7

*Hoffmann-La Roche, Inc. v. Sperling*,
        493 U.S. 165 (1989)........................................................................................15

*Julian v. City of Houston*,
        314 F.3d 721 (5th Cir. 2002) ........................................................................4-6

*Mota v. The Univ. of Tex. Houston Health Sciences Ctr., et al*,
        261 F.3d 512 (2001)........................................................................................12

*Olitsky v. Spencer Gifts, Inc.*,
        964 F.2d 1471 (5th Cir. 1992) ........................................................................14

*Palasota v. Haggar Clothing Co.*,
        499 F.3d 474 (5th Cir. 2007) ........................................................................4-5

*Pettway v. Am. Cast Iron Pipe Co.*,
        494 F.2d 211 (5th Cir. 1974) ..........................................................................14

*Pierce v. Athinson, Topeka and Santa Fe Railway*,
        65 F.3d 562 (7th Cir. 1995) ............................................................................12

*Pollard v. E.I. DuPont de Nemours & Co.*,
        532 U.S. 843 (2001)..........................................................................................5

*Reneau v. Wayne Griffin & Sons, Inc.*,
    945 F.2d 869 (5th Cir. 1991) ........................................................................6, 12

*Sellars v. Delgado*,
    839 F.2d 1132 (5th Cir. 1988) ...........................................................................14

*Tyler v. Bethlehem Steel Corp*,
    958 F.2d 1176 (2d Cir. 1992)..............................................................................12

*Uffelman v. Lonestar Steel Co.*,
    836 F.2d 404 (5th Cir. 1989) .............................................................................14

*Wilson v. Monarch Paper Co.*,
    939 F.2d 1138, 1147 (5th Cir. 1991) ..................................................................6

## STATUTES

29 United States Code
    Section 216(b)..............................................................................................15
    Section 621 *et seq.* ........................................................................................1
    Section 621(a)(1) .........................................................................................9
    Section 626(b) .........................................................................................4, 14

Texas Constitution
    Article 1 § 15 ..............................................................................................2

Tex. Fin. Code
    Section 304.103...........................................................................................15

Tex. Lab. Code
    Section 21.001 *et seq.* ....................................................................................1
    Section 21.259.............................................................................................15

## RULES

Federal Rules of Civil Procedure
    Rule 54(d) ..................................................................................................15

Federal Rules of Evidence
    Rule 201 ......................................................................................................2

Local Civil Rules of Northern District of Texas
    Rule 54.1 ...................................................................................................15

**OTHER SOURCES**

"The Great Recession at 30 Months," PEW RESEARCH CENTER (Jun. 30, 2010)...........................10

"For the Unemployed Over 50, Fears of Never Working Again,"
THE N.Y. TIMES (Sep. 19, 2010) ......................................................................................................1

TO THE HONORABLE REED O'CONNOR:

On July 13, 2010, a unanimous jury found that Raytheon Company wilfully and maliciously terminated Richard Miller because of his age on March 13, 2008.  [Doc. 102; T.7/89:12-90:25]  Miller pled and showed entitlement to back pay—including lost wages and retirement benefits—and the jury awarded amounts for those losses.  In addition, it awarded both mental anguish and punitive damages.  Miller now addresses his claims for liquidated damages, attorney's fees and costs, pre- and post-judgment interest, and front pay.

## SUMMARY OF THE FACTS

As shown at trial, Raytheon terminated Miller because of his age after 28.6 years of superb performance.[1]  Miller presented substantial evidence undermining the credibility of Raytheon's stated reason for the termination—a reduction in force—evidence of multiple available positions for which Miller was qualified but denied, and additional evidence of the disproportionate impact of the March 2008 RIF on Raytheon's older workers.

After four days of trial, the jury unanimously rejected Raytheon's asserted non-discriminatory reason and found instead that Raytheon terminated Miller because of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code §21.001 *et seq.* [Doc. 102 at 4]  The jury additionally found that Raytheon acted willfully (Question No. 2) and with malice or reckless indifference to Miller's rights (Question No. 6).  [*Id.* at 6, 11]  At Raytheon's request, the Court submitted a question on Raytheon's same-action affirmative

---

[1] The full trial transcript contains Volumes 1 through 7, excluding the transcript of the July 29, 2010 evidentiary hearing.  Throughout this document, Plaintiff references portions of the trial transcript by volume and page number (*i.e.*, [T.2/[page]:[line]).  He references the evidentiary hearing transcript by page number but uses a separate prefix (*i.e.*, [E.H./[page]:[line]) to distinguish it from the trial transcript.

defense (Question No. 4).  [*Id.* at 7; T.7/21:6-22:23]  The jury answered in the negative: it found

that Raytheon would not have terminated Miller when it did in the absence of his age.  [*Id.*]

Miller presented substantial evidence of the extensive harm resulting from Raytheon's

discrimination.   [Pl.'s Exs. 40A-46; T5/170:1-7]   Both Miller and his wife testified to the

devastation—personal, professional, and financial—wrought by Miller's illegal termination.

[T.4/230:12-233:16, 236:4-19, 253:2-12; T.6/113:7-117:20]  Each testified to Miller's diligent

and ongoing, though unsuccessful, efforts to obtain another position either within Raytheon or

elsewhere.   [T.4/243:16-247:20; T.5/181:4-11; T.6/61:16-67:20, 101:10-105:18, 105:19-106:6;

E.H./66:3-12; Pl.'s Exs. 23, 30, 33, 35, 49-50]   In addition, the jury heard testimony from

Miller's economic expert, Dr. J. Herbert Burkman, whose testimony and report detailed Miller's

lost compensation and pension benefits through the date of trial.  [Pl.'s Ex. 40; T.4/274:23-297:6;

T.5/5:1-40:20]

The jury heard Miller's evidence on damages and then Raytheon's rebuttal evidence, and

awarded Miller more than $500,000 in back pay.  Specifically, the jury found that Raytheon

caused Miller $352,179 in back pay and benefit losses (excluding pension) and $227,000 in lost

past pension benefits.  [Doc. 102 at 10]  In addition to pecuniary losses, the jury awarded

$1,000,000 in mental anguish damages and, after finding by clear and convincing evidence that

Raytheon acted with malice, another $15,000,000 in punitive damages.[2]  [*Id.* at 10, 12]

---

[2]  Miller anticipates that Raytheon will request a remittitur of these amounts based on the
TCHRA's damages caps.  If so, Miller will specifically challenge the constitutionality of the
TCHRA caps.  A limitation on punitive damages of $300,000, as applied to a mammoth
company such as Raytheon, offends the Texas Constitution.  Article 1, Section 15 makes the
"right of jury trial inviolate" and provides that the Legislature may only "pass such laws as may
be needed to regulate [the right to jury trial], and to maintain its purity and efficiency."  *See* Tex.
Const. Art. 1, § 15.  Miller will urge the Court not to upset the jury's full award of mental
anguish and punitive damages.  Concerning punitive damages, Miller requests that the Court take
notice under FED. R. EVID. 201 that Raytheon employs 73,000 employees and is a $20 billion-

On July 29, 2010, the Court held an evidentiary hearing to address equitable issues such as reinstatement and front pay. Miller and Dr. Burkman testified again, and Raytheon's counsel cross-examined both. [E.H./2:12-46:12, 59:20-70:22] Prior to Miller's testimony, the parties stipulated that reinstatement was not feasible. [E.H./46:18-25] Miller's presentation therefore focused on front pay issues. He credibly testified, as he had in the liability phase of trial, that he did not have firm retirement plans prior to his termination and that his intentions were to work through at least age 70. [E.H./60:12-61:23] Miller reiterated his earlier testimony that he has diligently sought employment but that would-be employers have repeatedly rejected him. [E.H./59:21-60:11, 61:24-62:17] An evident concern of would-be employers is why Miller would leave Raytheon abruptly in March 2008 after nearly 30 years with the company. Miller is forced to explain that the company terminated him. [T.6/114:18-20] Additionally, Miller, who was 53 when Raytheon terminated him in March 2008, is now nearly 56 years old and seeking employment in a time of historically high unemployment. [E.H./40:25-41:11] Given his ongoing inability to obtain employment, Miller's testimony and un-rebutted evidence is that his future losses will be substantial.

Dr. Burkman's testimony and report credibly and logically demonstrate Miller's substantial future losses. The Court admitted an un-redacted copy of Dr. Burkman's written

---

plus defense and aerospace systems supplier. [Attachment 1] Raytheon's net worth in 2009 was nearly $10 billion. [Pl.'s Ex. 39; T.5/9:25-10:12] The TCHRA's $300,000 cap has the perverse effect of limiting the jury's punitive damage award to a "punishment" amounting to $4.11 per Raytheon employee, or stated another way, less than one-ten-thousandth of the company's net worth. "Punishing" Raytheon at the effective rate of the cost of a sandwich for each employee is neither "efficient" nor a "pure" expression of the jury's evident disapproval of Raytheon's malicious conduct. As a punishment, it does nothing to curb age discrimination in the future.

assessment of Miller's economic losses during the July 29, 2010 hearing.  [Pl.'s Ex. 40A] [3] According to Dr. Burkman, Miller can expect to incur a cumulative economic loss (reduced to present value) from wages and (non-pension) benefits of $2,887,190 to retirement age (*i.e.*, 70). [Pl.'s Ex. 40A/Table 4A]  Dr. Burkman also testified about Miller's lost future pension benefits and lost 401(k) savings benefits, concluding that Miller will lose 401(k) savings at a present value of $115,488 (E.H./22:4-12) and future pension benefits at a present value of $461,241 (E.H./19:3-11).   [Pl.'s Ex. 40A/Tables 4A, 7]   Dr. Burkman avoided double recovery by subtracting the jury award ($227,000) of past pension benefits from the full amount calculated for future pension losses ($688,241).

## ARGUMENTS AND AUTHORITIES

The ADEA gives courts discretion to "grant such legal or equitable relief as may be appropriate to effectuate" the statute's central purpose of making discrimination victims whole.[4] Courts have broad authority to formulate remedies in furthering that objective.[5]

The jury has already determined the proper amounts of back pay, compensatory damages (*i.e.*, mental anguish), and punitive damages. In addition to those damages, Miller seeks front pay and benefits, liquidated damages, pre- and post-judgment interest, and attorney's fees and costs of suit as discussed below.  Miller asks this Court to make him whole by using its broad equitable powers to remedy the premature end of his professional career caused by Raytheon's age discrimination.

---

[3] The Court received a redacted version of the Burkman report on July 9, 2010 for the jury with the portions dealing with future losses excised.

[4] *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 488 (5th Cir. 2007)(quoting 29 U.S.C. §626(b) and *Julian v. City of Houston*, 314 F.3d 721, 728 (5th Cir. 2002)).

[5] *Julian*, 314 F.3d at 728.

In order to make him whole, Miller urges the Court to decline Raytheon's invitation to speculate—in Raytheon's favor and contrary to the record—that Miller will obtain equivalent employment soon, or as Raytheon's economist seemed to opine, that Miller somehow already has a replacement job.  Besides (a) the fact that Miller's un-contradicted evidence is that he has not obtained replacement employment and (b) the fact that there is no evidence whatsoever that Miller has already found a replacement job, Dr. Reynolds's opinion is contrary to the jury's finding as to back pay.  The jury's finding concerning back pay reflects the fact that Miller was not receiving compensation, despite his diligent search, from the time of termination through trial.  Miller appears no closer to working again five months after the July 29, 2010 evidentiary hearing.  He certainly has not obtained the hypothetical purchasing manager job that Dr. Reynolds assumed for him.

1.     **Since reinstatement is not feasible and Raytheon's unlawful actions forced Miller into long-term unemployment, the Court should award Miller full front pay and benefits**

Where reinstatement is infeasible, it is within a court's equitable power to award front pay.  Front pay is "simply a money award for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."[6]  It is a prospective remedy that fairly estimates the amount of damage a person will suffer post-judgment as a result of the defendant's wrongdoing.[7]  Importantly, back pay and front pay are distinct remedies, and achieving make-whole relief may require courts to award both.[8]

---

[6] *Pollard v. E.I. DuPont de Nemours & Co.*, 532 U.S. 843, 846 (2001).

[7] *Palasota*, 499 F.3d at 490-91.

[8] *Julian*, 314 F.3d at 729.

Raytheon stipulated that Miller's reinstatement is not feasible. [E.H./46:18-25] An award of front pay is appropriate in these circumstances because the evidence shows that Miller's damages will continue to accrue and that he will experience substantial losses into the future. [Pl.'s Ex. 40A/Tables 4A, 7] The question for the Court, then, is the amount of future compensation necessary to make Miller whole.

Calculations of front pay are prospective and necessarily involve some degree of speculation. This determination requires "intelligent guesswork" to arrive at a reasonable estimate.[9] The need to speculate as to the future, however, is not grounds for denying front pay. Rather, "the fact that calculating front pay involves some degree of speculation is a risk that [Raytheon] must bear as a proven discriminatory employer."[10] Thus, the traditional rule in this Circuit is that "uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer."[11]

In deriving the proper amount of front pay, courts are not bound by any set length of time.[12] Instead, this assessment takes account of factors such as (1) the length of the plaintiff's employment, (2) the permanency of the position, (3) the nature of work, (4) the plaintiff's age and physical condition, (5) possible job consolidation, and (6) the "myriad other non-discriminatory factors which could validly affect the possible [Miller/Raytheon] post-discharge

---

[9] *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991).

[10] *Julian*, 314 F.3d at 729.

[11] *Cf. Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1147 (5th Cir. 1991)(affirming jury award of back in age discrimination case)(internal citation omitted).

[12] *Reneau*, 945 F.2d at 871.

employment relationship."[13]   At least the first four of these factors support a substantial front pay award extending to Miller's probable retirement at 70.

First, Miller was a long-standing employee.   It is uncontested that his career with Raytheon spanned 28.6 years, and that he achieved 23 ratings of "exceeds" or "far exceeds." [T.6/24:3-16; Pl.'s Exs. 2-3, 25]   Raytheon's personnel records reflect the company's repeated, consistent acknowledgment of Miller's productivity through pay increases, achievement awards, and results-based-incentive ("RBI") merit bonuses.   [Pl.'s Exs. 42, 45-46]   On cross-examination, Raytheon, through Allen Reid, conceded that the "promotion boat" had not sailed for Miller.   [T.4/151:4-15]   Stated differently, had Miller remained a Raytheon employee, he could have—and likely would have—received promotions just as he had in the past.

Second, the supply chain and operational functions that Miller performed over the years are remarkably stable in terms of Raytheon's business.   Testimony at trial showed that Miller, who essentially "wrote the book" for Material Program Managers ("MPMs"), was qualified for positions throughout Space and Airborne Systems.   [T.6/36:23-37:7, 39:2-40:4, 127:4-8]   Miller presented evidence of as many as 12 positions between the A05 and A07 salary grades that were open just prior to and after his termination.   [Pl.'s Ex. 61]   And a Raytheon witness, Allen Reid, testified about two site-lead positions open in April 2008 for which he believed Miller qualified. [T.4/107:9-24]   Whether or not Miller continued to handle the PRISM reporting function, the need for qualified, skilled operations managers and MPMs like Miller has not gone away. Notably, Raytheon, which has experienced robust growth for much of the past ten years, is itself a healthy business even in these uncertain economic times.   [E.H./56:4-7]

---

[13] *Id.*; *cf. Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007)(in FMLA case, reviewing front pay award in light of *Reneau* factors).

Third, the nature of Miller's work at Raytheon was such that he could expect to work late into life.  The area of supply chain management in which Miller worked involved little physical rigor or risk of physical injury.  Another MPM worked at Raytheon into his late 60s, and Raytheon's primary witness, Robert Lyells, is several years older than Miller.  [Pl.'s Ex. 52/p. 4; T.6/229:12-20; E.H. 48:14-24]  Lyells continues working at the company.  [*Id.*]  But for age discrimination, Miller probably would have retired from Raytheon, as he intended to do and just as his grandfather, father and two brothers retired from their employers after 30-to-40 year careers.  [T.6/188:22-189:10]

Fourth, and related to the third factor, Miller's current age (nearly 56) and physical condition argue for an extended front pay period.  Miller's testimony and evidence reflect his exhaustive and energetic efforts to obtain work.  [T.4/243:16-247:20; T.5/181:4-11; T.6/61:16-67:20, 101:10-105:18, 105:19-106:6; E.H./66:3-12; Pl.'s Exs. 23, 30, 33, 35, 49-50]  The evidence demonstrates that job prospects for a 56-year-old with the black mark of a termination on his resume are slim in this economy.  [E.H./62:8-17, 46:2-12]  Employers like Raytheon—which favors younger employees through "deep reach" advancement opportunities and resume-building programs like the Leadership Development Program—are unlikely to give Miller serious consideration.  [T.5/162:19-164:9]  It is a sad fact—and not speculation—that Raytheon, well-aware of Miller's attractive resume, rich experience, and deep qualifications, as well as his talent, work ethic, and abiding desire to remain with the company, shut Miller out of the Raytheon job market from the time of termination through trial and has no interest in returning him to its payroll.  That all potential employers have thus far turned a blind eye to Miller's applications is powerful evidence of the harsh reality facing Miller.  Thus, while he is able, willing, and desperate to work, the preponderance of the evidence is that that Miller faces

unemployment from this point forward. Meanwhile, it would be improbable, unreasonable, and unfair to speculate that after what is stretching into years of long-term unemployment, thus negating an otherwise stellar resume, some employer will reach out to Miller with a position comparable to the one he had.

A sad irony confronting one who is fired at age 53 (and now almost 56) is that the same wonderful resume, skills and promotions that made him a good fit for the job prior to termination renders him "overqualified" and unemployable in lesser positions after termination.[14] Congress' declaration accompanying its passage of the ADEA in 1967 sounds truer now than ever:

> [I]n the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from their jobs ….

> 29 U.S.C § 621(a)(1).

The disadvantages faced by older workers seeking re-employment—regrettably un-remedied over the past four decades—also respond to Raytheon's economist's conclusions concerning Miller's future job prospects. The Bureau of Labor Statistics ("BLS") figures cited in Dr. Reynolds's report (Def.'s Ex. 25) do not accurately reflect Miller's actual experience. They do not address the fact that Miller's thorough job search has been unsuccessful, fail to measure the duration of unemployment for an older worker who has sued his former employer for age discrimination, and perhaps most importantly, do not measure the unemployment experience of older unemployed workers during the most severe recession in the U.S. economy since the Great Depression. While Raytheon's business appears to have weathered the storm, the U.S. economy overall remains mired in the "Great Recession," a period of economic troubles

---

[14] *See also* E.H./67:19-25.

producing historically high unemployment that begin in about December 2007.[15]   [40:25-41:11]
The BLS figures relied upon by Dr. Reynolds simply do not speak to the expected duration of
Miller's job loss following his termination by Raytheon on March 13, 2008.

The Court should consider each of these factors supporting Miller's front-pay claim.
Miller submits that $2,556,278 is the appropriate amount of front pay, excluding future pension
and retirement losses, that should be entered.  Dr. Burkman generated lost-future-compensation
estimates based on two scenarios—one assuming Miller remains unemployed (Pl.'s Ex.
40A/Table 4A) and one assuming that he partially replaces his earnings (Pl.'s Ex. 40A/Table
4B).  The reality is that as of the July 29, 2010 hearing—and still as of filing—Miller has not
obtained replacement employment despite his best efforts.  Common sense and experience, Dr.
Burkman's testimony ([E.H./46:2-12]), and current economic conditions suggests that the longer
Miller remains unemployed, the less likely he will find such work.  Consequently, a front pay
calculation including no offsets for replacement employment becomes a greater reflection of
reality as time goes on.[16]

Miller acknowledges that his duty to mitigate is ongoing, and he remains hopeful that the
discriminatory discharge will not prevent him from ever working again in his field.  Miller also
acknowledges that the Court could employ various "intelligent guesswork" methodologies to

---

[15] *See* "The Great Recession at 30 Months," PEW RESEARCH CENTER (Jun. 30, 2010), *available
at*  http://pewresearch.org/pubs/1643/recession-at-30-monhts-extensive-job-loss-frugality-lower-
expectations (last visited on Dec. 22, 2010)(*see* Attachment 2); *see also* "For the Unemployed
Over 50, Fears of Never Working Again," THE N.Y. TIMES (Sep. 19, 2010), *available at*
http://www.nytimes.com/2010/09/20/business/economy/20older.html?_r=1&emc=eta1       (last
visited on Dec. 22, 2010)(*see* Attachment 3).

[16] Although Dr. Burkman offered two future compensation scenarios, both Table 4A and Table
4B (*see* Pl.'s Ex. 40A), he testified that Table 4A, reflecting no offset income, was the more
probable loss scenario because it reflects Miller's persistent inability, through no fault of his
own, to find replacement work.  [E.H./45:20-46:12]

arrive at a rational front pay number.  Taking account of these considerations, Miller believes

that a calculation giving weight to both scenarios—some period of unemployment followed by

partial replacement employment—is both reasonable and supported by the evidence.  Miller

urges the Court to use its discretion to fix a number that is weighted toward Dr. Burkman's Table

4A but that accounts for Tab 4B on a 25% basis as follows:

| Burkman Table (Pl.'s Ex. 40A) | Amount |
|---|---|
| 4A | $2,887,190 |
| 4A | $2,887,190 |
| 4A | $2,887,190 |
| 4B | $1,563,543 |
| SUB-TOTAL | $10,225,113 |
| LOST FUTURE COMPENSATION (SUB-TOTAL DIVIDED BY 4) | $2,556,278 |
| FUTURE RETIREMENT/PENSION BENEFITS | $576,729 |
| TOTAL FRONT PAY (incl. retirement/pension benefits) | $3,133,007 |

Miller testified that he planned to retire from Raytheon and that his intentions were to

work until at least age 70. [E.H./60:12-61:4; T.6/68:11-19]  He presented evidence of historical

earnings at Raytheon (*see* Pl.'s Ex. 42), a record that Dr. Burkman characterized as "amazingly

detailed" and comprehensive.  [T.4/282:9-13]  From this record Dr. Burkman was able to

calculate a growth rate based on nine years of historical earnings information, and then used that

growth rate (7.3%) to calculate future earnings and retirement benefits.[17]  Miller's evidence was

---

[17] Although Raytheon attempts to portray Dr. Burkman's growth rate as wildly inflated, the 7.3% figure used for years 2011-2015 is, on the one hand, grounded in Miller's own lengthy earnings history and, on the other, in line with growth rates accepted by this Court in other discrimination cases.  *See Dibler v. Metwest, Inc.*, No. 3:95-cv-1046-BC, 1997 WL 222910, **3-4 (N.D. Tex.

not only a sufficient basis for a front pay award but surpasses the sorts of information that the Fifth Circuit finds to be "substantial evidentiary support for calculating a front pay award."[18]

The record contains the evidence necessary for the Court to employ "intelligent guesswork" in determining the proper amount of front pay. Miller believes that the record adequately supports his claim for front pay until age 70. While there is no fixed term of front pay, the Fifth Circuit and other Circuit courts have indicated that the 14-year front pay period in this case is within the realm of reasonableness:

- In *Mota v. The Univ. of Tex. Houston Health Sciences Ctr., et al.*, the Fifth Circuit affirmed the district court's award of front pay over 15 years in a same-sex harassment case under Title VII. 261 F.3d 512, 527 (2001). The district court initially *limited* the award to ten years of lost future wages before adding back five years in light of the defendant's post-verdict vindictive conduct.

- In *Tyler v. Bethlehem Steel Corp.*, the Second Circuit affirmed a front pay estimate based on an 8.3% annual growth rate and paid over the remaining 17 years of the plaintiff's work life. 958 F.2d 1176, 1189 (2d Cir. 1992).

- In *Pierce v. Athinson, Topeka and Santa Fe Railway*, the Seventh Circuit upheld a front-pay period of ten years in view of its conclusion that the plaintiff was as "likely as any, and probably more likely than most, to work to retirement if he had the ability to do that." 65 F.3d 562, 574 (7th Cir. 1995). Notably, like Miller, the plaintiff in *Pierce* testified to the "immense importance" of his job and its role as a source of personal pride. [T.4/229:21-230:4; T.6/67:9-15, 188:22-189:10]

- In *Cummings v. Standard Register Co.*, the First Circuit upheld an award of front pay over 14 years to the plaintiff, a victim of age discrimination, based on evidence that the plaintiff was a long-term employee and was unable to find comparable work despite substantial effort. 265 F.3d at 66 (1st Cir. 2001).

---

1997)(Boyle, J.)(awarding front pay based on a 7% annual salary growth rate); *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1189 (2d Cir. 1992)(using 8.3% annual growth rate).

[18] *Reneau,* 945 F.2d at 870 (reviewing evidence of the employee's hourly rate and offset earnings).

The Fifth Circuit's *Mota* opinion and these authorities support Miller's claim for front pay extending to his expected retirement at age 70. They instruct that a lengthy front-pay period is at times necessary to make whole someone as extensively harmed as Miller.

It is important to remember that Raytheon, which is urging an almost negligible front pay recovery, (1) intentionally terminated Miller because of his age, (2) refused to put him back to work in any one of several available jobs for which he was qualified (or over-qualified), and (3) has a vested interest in staking out the unrealistic position that Miller will somehow soon "land on his feet." Indeed, Raytheon's expert, Dr. Helen Reynolds, testified that that her understanding of front pay was the amount needed to allow a discharged employee to be "put back on [his] feet to get [him] going." [E.H./72:8-12] This definition is fundamentally wrong. It departs from the standard approved by the Fifth Circuit and is at odds with the make-whole remedial policies of the ADEA and TCHRA.

It is one thing to put someone "back on [his] feet" after a job loss. It is something altogether different to make him whole. While one year's pay may help an unemployed victim of age discrimination pay some bills and keep his home and family together for a time, that amount is 15 times too little to make him whole if he remains "off his feet," that is, long-term unemployed, for 15 years—unless, of course, that victim of age discrimination dies, wins the lottery, or actually finds a replacement job. Dr. Reynolds's "back on [his] feet" front-pay formula definitionally understates the amount of front pay called for by the ADEA and TCHRA.

Miller seeks an appropriate amount of front pay, in line with the guidance of Fifth Circuit and Texas authorities—no more, and no less. Accordingly, Miller requests an award of $3,131,007 in front pay to compensate him for the ongoing harm resulting from Raytheon's willful and malicious age discrimination.

**2.     The jury's finding that that Raytheon willfully discriminated against Miller because of age entitles him to liquidated damages**

Where, as here, the jury finds that an employer discriminated willfully, the plaintiff is entitled to liquidated damages.[19]   That is, a finding of willfulness "entitles a plaintiff to a doubling of any back pay award."[20]

Here, the jury found that Raytheon willfully discriminated against Miller in violation of the ADEA and awarded $579,179 in combined back pay losses.  Both Miller's lost wages and non-pension benefits and his lost past pension benefits are proper components of a liquidated damages award.[21]   Miller therefore respectfully urges the Court to include an award of $579,179 in liquidated damages in its judgment.

**3.     The TCHRA entitles Miller to both pre-judgment and post-judgment interest**

In addition to back pay and other damages, Miller is entitled to prejudgment interest on the amount awarded for back pay.[22]   Interest typically should be included in a judgment in order to make the plaintiff whole.[23]   Similarly, Texas statutes authorize post-judgment interest.[24]

---

[19] *See* 29 U.S.C. § 626(b).

[20] *Uffelman v. Lonestar Steel Co.*, 836 F.2d 404 (5th Cir. 1989)(noting that a "finding of willfulness is of particular importance since it [] entitles a plaintiff to a doubling of any back pay award….").

[21] *See Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471, (5th Cir. 1992)(affirming award of liquidated damages comprising both back pay and lost pension benefits).

[22] *See City of Houston v. Fletcher*, 166 S.W.3d 479, 493 (Tex. Ct. App.—Eastland 2005, pet. denied); *City of Austin v. Grifford*, 824 S.W.2d 735, 743 (Tex. App.—Austin 1992, no writ).

[23] *See Sellers v. Delgado*, 839 F.2d 1132, 1140 (5th Cir. 1988)(citing *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 264 (5th Cir. 1974)); *see also Deloach v. Delchamps, Inc.*, 897 F.2d 815, 823 (5th Cir. 1990)(noting the plaintiff's entitlement to prejudgment interest on amount of front pay deemed appropriate by the court); *City of Austin v. Gifford*, 824 S.W.2d 735, 743 (Tex. Ct. App.—Austin 1992)(noting that the TCHRA is designed to execute the policies of Title VII, which allow for prejudgment interest).

The statutory interest rate for the period ending on August 31, 2010 was 5.0% per annum.[25]  Accordingly, Miller asks that the Court include an award of prejudgment interest at a rate of 5.0% per annum in its judgment and award post-judgment interest at that rate from the date of judgment.

### 4.     Raytheon is liable for Miller's reasonable attorney's fees and costs because Miller is the prevailing party

The ADEA incorporates the remedial provisions of the Fair Labor Standards Act, which provides that "[t]he Court … shall, in addition to any judgment awarded to the plaintiff …, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."[26]  The TCHRA contains a similar provision awarding prevailing plaintiffs their attorney's fees and costs, including expert costs.[27]

Miller intends to submit an application for attorney's fees and costs under Federal Rule of Civil Procedure 54(d) and Northern District Local Rule 54.1.  He therefore requests that the Court's judgment include an award of attorney's fees and costs and establish a schedule for the parties' briefing on the issue.

<u>**CONCLUSION**</u>

Miller respectfully requests that the Court include the following remedial elements in its judgment:

1.  Back pay in the amount of $579,179;

---

[24] TEX. FIN. CODE § 304.103.

[25] *See* http://www.occc.state.tx.us/pages/int_rates/Index.html (last visited Dec. 21, 2010).

[26] 29 U.S.C. § 216(b); *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 167 (1989)(noting that the ADEA is to be enforced using the powers, remedies and procedures of the FLSA).

[27] TEX. LAB. CODE § 21.259.

<u>**Plaintiff's Post-Trial Brief**</u> – Page 15

2. Liquidated damages in the amount of $579,179;

3. Compensatory damages in the amount of $1,000,000;

4. Punitive damages in the amount of $15,000,000;

5. Since reinstatement is not feasible, front pay in the amount of $3,133,007;

6. Pre- and post-judgment interest at a rate of 5.0% per annum (or the prevailing rate on the date of judgment, if different); and

7. An award of reasonable costs and attorney's fees to be determined following submission of an application for fees and costs in accordance with Federal Rule 54(d).

DATED:  December  22, 2010                    Respectfully submitted,

GILLESPIE, ROZEN & WATSKY P.C.
3402 Oak Grove Avenue, Suite 200
Dallas, Texas 75204
Tel:  (214) 720-2009
Fax: (214) 720-2291

*/s/ Hal K. Gillespie*
Hal K. Gillespie
*Attorney-in-Charge*
Texas Bar No. 07925500
hkg@grwlawfirm.com
Yona Rozen
Texas Bar No. 17958500
yrozen@grwlawfirm.com
James D. Sanford
Texas Bar No. 24051289
jsanford@grwlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 22, 2010 he electronically submitted the foregoing document to the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court.   The electronic case files system sent a "Notice of Electronic Filing" to the following individuals, who have consented in writing to accept this Notice as service of this document by electronic means:  Michael P. Maslanka, Esq., and Buena Vista Lyons, Esq., of FORD & HARRISON LLP, attorneys for Defendant Raytheon Company.

*/s/ James D. Sanford*
One of Plaintiff's Counsel
